MANDELBAUM SALSBURG P.C.
3 Becker Farm Road
Roseland, New Jersey 07068
(973) 295-4600

DUNNEGAN & SCILEPPI LLC
350 Fifth Avenue
New York, New York 10118
(212) 332-8300

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SPINNER CONSULTING LLC, <br><br> *Plaintiff*, <br><br> -*against*- <br><br> STONE POINT CAPITAL LLC, <br><br> *Defendant*. | 19-cv-13471 <br><br> **COMPLAINT AND JURY DEMAND** |

Plaintiff Spinner Consulting LLC ("Spinner"), by its undersigned attorneys, on behalf of itself and those similarly situated, for its complaint against defendant Stone Point Capital LLC ("Stone Point"), alleges:

## NATURE OF THIS ACTION

1.      Spinner is bringing this action because Stone Point, an affiliate of Bankruptcy Management Solutions, Inc. ("BMS"), has participated in a conspiracy with BMS and BMS's two largest competitors, in violation of the Sherman Act, 15 U.S.C. § 1, to fix the manner of charging Chapter 7 bankruptcy estates ("Estates") for bankruptcy support services.  This conspiracy, which one bankruptcy trustee has termed "a train robbery," has unlawfully reduced competition and extracted excessive, if not exorbitant, fees from Estates.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over the claim in this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) because it arises under 15 U.S.C. §§ 1 and 15.

3.     This Court has supplemental jurisdiction over the second and third claims in this action pursuant to 28 U.S.C. § 1367 because they are so related to the first claim that they form part of the same case or controversy within the meaning of Article III of the United States Constitution.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because this Court has personal jurisdiction over Stone Point as a result of 15 U.S.C. § 22.

## THE PARTIES AND THE PRINCIPAL ACTORS

5.     Stone Point is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Greenwich, Connecticut.  Stone Point is a private equity firm that through Trident VI Funds, LLC ("Trident") acquired BMS on or about April 12, 2017.

6.     BMS is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Irvine, California.  BMS is the largest provider of bankruptcy support services, including software, in the United States.  On or about January 22, 2019, BMS announced its intention to do business under the name "Stretto."

7.     Epiq eDiscovery Solutions, Inc. (formerly "Epiq Systems, Inc.") ("Epiq") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Atlanta, Georgia.  Epiq is the largest competitor of BMS in the national market for bankruptcy support services.

8.      TrusteSolutions is a division of Financial Software Solutions, LLC ("TrusteSolutions"), a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business in Houston, Texas.  TrusteSolutions is the second largest competitor of BMS in the national market for bankruptcy support services.

9.      Rabobank N.A. ("Rabobank") is a banking corporation organized under the laws of the United States.  Rabobank is, and since about November 2012 has been, the bank in which BMS has required Trustees using BMS bankruptcy support services to deposit all, or substantially all, of the funds of the Estates that they administer.

10.     Robert Fusari ("Fusari"), a natural person, filed a petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey on or about March 31, 2015.  As the result of paragraph 16 of that Court's order entered May 6, 2016, the residual property of the Estate in that bankruptcy case vested in Fusari.

11.     Spinner, a limited liability company organized and existing under the laws of the State of New Jersey, acquired the property that had vested in Fusari under that order, pursuant to an agreement with Fusari dated as of July 27, 2018.

## BACKGROUND OF THIS ACTION

### A.      Chapter 7 of the Bankruptcy Code

12.     The filing of a petition under Chapter 7 of the Bankruptcy Code creates an Estate. In general terms, the Estate consists of the property of the debtor at the time of the filing of the petition and the property resulting from it.

13.     Upon the filing of such a petition, the Office of the United States Trustee, a Division of the United States Department of Justice ("U.S. Trustee"), appoints a Trustee from the private sector to administer the Estate.  The Estate compensates the Trustee for this service.

14.     The principal duty of the Trustee is to collect and liquidate the property of the Estate and to distribute the proceeds as appropriate.  The Trustee also has a duty to make certain reports concerning the Estate to the U.S. Trustee and to the Bankruptcy Court.

**B.     The National Market for Bankruptcy Support Services**

15.     Upon information and belief, since 1987, BMS has provided bankruptcy support services, including software, to assist Trustees in meeting their reporting and other obligations.

16.     Upon information and belief, BMS began its operations as a spin-off of a bank that had previously provided free bankruptcy software to Trustees in exchange for their deposits of Estate funds at the bank.

17.     Upon information and belief, BMS developed the software to assist Trustees in meeting their reporting and other obligations.

18.     Upon information and belief, BMS secured copyright protection in this software, exercised reasonable precautions to ensure the confidentiality of the source code for the software, and updated the software over time.

19.     Upon information and belief, the competitors of BMS have developed and maintained comparable software.

20.     Upon information and belief, Trustees do not, at any one time, use more than one provider of bankruptcy support services of the type that BMS provides.

21.     BMS has acquired market power – meaning the power to control prices – in the market for selling bankruptcy support services to Trustees.  The standard contract between BMS and a Trustee allows BMS to set its fee, in BMS's discretion, at any amount permitted by law. That standard contract of BMS with a Trustee provides:

> As permitted by law or your applicable regulatory authority, BMS, Bank or Financial Institution shall have the right to charge your account with a service fee via ACH debit or

otherwise.  **Such fee shall be determined by BMS in its sole discretion**, provided however, such fee shall in no case exceed the maximum service fee permitted by law or your applicable regulatory authority and shall be debited to your account(s) on a monthly basis for the preceding month. (Emphasis added.)

22.    BMS has only limited competition in the national market for bankruptcy support services.  Upon information and belief, as measured by the number of Trustees in the United States, BMS has about a 50 percent share, Epiq has about a 35 percent share and TrusteSolutions has about a 15 percent share of the national market for bankruptcy support services.  BMS requires Trustees who use its services to deposit the funds of the Estates that they administer at a partner bank of BMS.

23.    Upon information and belief, before about November 2012, BMS required its Trustees to deposit funds of the Estates that they administered using BMS support services at Bank of New York Mellon.

24.    Upon information and belief, at all relevant times after about November 2012, BMS required its Trustees to deposit funds of the Estates that they administered using BMS bankruptcy support services at Rabobank.

25.    Upon information and belief, Rabobank now holds all of the funds of the Estates of each Trustee that uses BMS bankruptcy support services to administer an Estate.

26.    Upon information and belief, Rabobank currently holds about $2 billion in deposits from Trustees who contract with BMS.

**C.    The Manner of Charging Fees for Bankruptcy Support
Services Based upon the Amount of Money in the Estate**

27.    Prior to the financial crisis beginning in 2008, BMS did not charge fees directly to an Estate.  Rather, BMS would direct the Estate to deposit its funds in a selected bank.  The bank

would earn money from these deposits, and, upon information and belief, the bank would pay a fee to BMS and interest to the Estate.

28.     After the financial crisis, interest rates declined.  As a result of this decline in interest rates, the amount of money that the bank could earn from the deposits of Estates also declined, as did the bank's ability to pay BMS a fee.

29.     Before November 26, 2010, to increase its profits without providing any additional services, BMS considered the idea of directly charging Estates a fee for bankruptcy support services.

30.     Upon information and belief, BMS considered charging that fee to Estates in different ways, including (a) on a per Trustee basis, (b) on a per case basis, and (c) on a per transaction basis, such as by report generated.  BMS, however, never charged a fee to an Estate in any of these ways.

31.     Before November 26, 2010, BMS considered a non-traditional method of charging its fee.  Specifically, BMS considered selling bankruptcy support services only in combination with bankruptcy banking services ("Combined Services") and charging Estates no fee for those Combined Services other than a percentage of the money in the bank account of the Estate.

32.     Upon information and belief, BMS preferred this non-traditional manner of charging fees over the other methods it had identified.  This non-traditional manner of charging fees would not allow Estates to determine the extent to which BMS, as opposed to its partner bank, received the fee.  This non-traditional manner of charging fees would also make it more difficult for the Estates to determine whether the fee for bankruptcy support services was modest, reasonable, or excessive.

33.     Upon information and belief, BMS understood that the marketplace would accept this non-traditional manner of charging fees if, and only if, the three major providers of bankruptcy support services – BMS, Epiq and, TrusteSolutions – charged for Combined Services in the same way.

**D.     The Conspiracy to Fix the Manner of Charging for Combined Services**

34.     Before November 26, 2010, BMS proposed to Epiq and, upon information and belief, to TrusteSolutions that they, *inter alia*, sell bankruptcy support services only as Combined Services, and charge no fee to an Estate for those Combined Services other than a percentage of the amount in the bank account of the Estate.

35.     Before November 26, 2010, Epiq and, upon information and belief, TrusteSolutions each, directly or through an agent, accepted this proposal of BMS to fix the manner of selling and charging for those Combined Services, as detailed below.

**E.     The Change in the Rules to Allow Banks to Charge Direct Fees**

36.     Before November 26, 2010, BMS understood that although the United States Bankruptcy Court with jurisdiction over each Estate had authority to approve actual and necessary administrative expenses, charging an Estate a fee for Combined Services could violate the rule of the U.S. Trustee that prohibited Trustees from paying bank fees from Estate accounts.

37.     BMS, Epiq and TrusteSolutions requested that the U.S. Trustee suspend that rule, and allow Trustees to pay bank fees from Estate accounts.

38.     On or about November 26, 2010, BMS submitted a document to the Executive Offices of the U.S. Trustee, entitled "Bank Participation In The Chapter 7 Program," a copy of which is annexed as Exhibit A (the "BMS Document"), that provided in applicable part:

**Conversations**

**In several conversations with various participant banks, a number of options have been discussed.  Satisfying all of the conditions presented above, however, left a single structural option**.  Although the numbers vary slightly for each bank, the structure is constant with two key components:

> First, since estates do not currently pay for services (banking and software) through a reduction in their interest income, **have them continue to pay for these services via a service fee, as a % of average deposit balance assessed monthly on each account.**

> Second, while there would be a base service fee percentage the actual percentage applied would vary reflecting changes, hopefully improvements, in the interest rate market by being tied to the Effective Federal Funds rate.  As the Effective Federal Funds Rate increases, the service fee would be reduced, eventually disappearing as bank interest rates increase.

> **Having determined a structural solution**, the principal remaining question of each bank was "what do you need to financially continue to participate in the Chapter 7 process including your expenses for administration and to fund your current software providers?" (Emphasis added.)

39.     Epiq received a copy of the BMS Document on, or shortly after, November 26, 2010.  In a document dated January 14, 2011 (the "Epiq Document"), Epiq stated with respect to the proposal contained in the BMS Document:

> This structure would promote future stability for Trustees activities, and it features well reasoned characteristics: ….

> - The fee is assessed uniformly to all estate accounts….

> - The fee is earmarked to support the technology and case management services on which trustees rely for the orderly administration of their estates, and it is not a windfall for any market participant.

40.     Epiq transmitted the Epiq Document to the U.S. Trustee on or about January 18, 2011.

41.     TrusteSolutions, through one of its partner banks, requested on or about January 21, 2011, that the U.S. Trustee allow this fee.

42.     On or about April 29, 2011, the U.S. Trustee suspended its rule prohibiting Trustees from paying bank service fees from Estate accounts.  The U.S. Trustee did not, however, approve any fee for bankruptcy banking services or bankruptcy support services, and did not approve any manner of charging either of those fees.

**F.      Execution of the Conspiracy to Fix the Manner of Charging Estates**

43.     After the U.S. Trustee suspended its rule prohibiting Trustees from paying bank fees from Estate accounts, BMS, Epiq, and TrusteSolutions, upon information and belief, reaffirmed their conspiracy to sell Estates bankruptcy support services only in combination with bankruptcy banking services, and to charge no fee to an Estate for those Combined Services other than a percentage of the amount in the bank account of the Estate.

44.     After April 29, 2011, BMS, Epiq, and, upon information and belief, TrusteSolutions acted on their conspiracy.

45.     After April 29, 2011, BMS and its partner bank entered into agreements with Trustees that required their Estates to pay a fee for Combined Services based upon a percentage of the money in the account of the Estate.

46.     After April 29, 2011, BMS and its partner bank then began deducting a fee for those Combined Services based upon a percentage of the amount in the account of the Estate.

47.     Upon information and belief, after April 29, 2011, neither BMS, Epiq, nor TrusteSolutions has charged a fee for bankruptcy support services (a) on a per trustee basis, (b) on a per case basis, or (c) on a per transaction basis, such as per report generated.

48.     Upon information and belief, pursuant to its conspiracy with Epiq and TrusteSolutions, BMS continues to sell bankruptcy support services only in combination with

bankruptcy banking services, and to charge Estates no fee for those Combined Services other than a percentage of the amount in the bank account of the Estate.

49.     Upon information and belief, except for certain minimum or maximum charges, (i) BMS and Rabobank charge fees at the annual rate of 1.75 percent of the amount on deposit at Rabobank, (ii) Epiq and its partner banks charge fees at the annual rate of 1.75 percent of the amount on deposit at those banks, and (iii) TrusteSolutions and its partner banks charge fees at the annual rate of 1.9 percent of the amount on deposit at those banks.

**G.     The Chapter 7 Petition of Fusari**

50.     On March 31, 2015, Fusari filed a petition under Chapter 7 of the Bankruptcy Code in the Bankruptcy Court for the District of New Jersey, as case no. 15-15604 (VHP).

51.     Upon the filing of the petition of Fusari, the U.S. Trustee appointed an individual, selected from its panel of Trustees, as the Chapter 7 Trustee of the Fusari Estate.  On or about April 27, 2015, the creditors of the Fusari Estate elected Alan E. Gamza ("Gamza") Trustee of the Fusari Estate, to replace the Chapter 7 Trustee the U.S. Trustee appointed.

**H.     The Contracts of BMS and Rabobank with the Fusari Estate, Signed by Gamza**

52.     On or about June 8, 2015, BMS entered into a contract with the Fusari Estate, that Gamza signed while acting solely in his capacity as Trustee of the Fusari Estate.

53.     Under the contract with BMS, the Fusari Estate promised (i) to deposit all, or substantially all, of its funds with Rabobank, and (ii) to allow Rabobank to automatically withdraw, without any approval of the Bankruptcy Court or notice to creditors, a monthly fee from the Estate accounts at Rabobank.

54.      On or about June 8, 2015, Rabobank entered into a contract with the Fusari Estate, that Gamza signed while acting solely in his capacity as Trustee to the Fusari Estate.

55.     This contract with Rabobank authorized Rabobank to automatically withdraw, without any approval of the Bankruptcy Court or notice to creditors, a monthly fee from the Estate accounts.

56.     Beginning on or about June 30, 2015, through on or about October 20, 2015, Gamza deposited the funds of the Fusari Estate into an account at Rabobank.

57.     Rabobank deducted a total of $15,627.98 from the account of the Fusari Estate at Rabobank without any notice to Fusari, the creditors or the Court.

58.     Rabobank never paid any interest on the funds in the account of the Fusari Estate.

59.     After the Bankruptcy Court converted the case to Chapter 11, Gamza filed his final account and distribution report on December 31, 2015.  That report disclosed that Rabobank had deducted a total of $15,627.98 from the Fusari Estate's account as a fee.  The report did not mention BMS.

60.     Upon information and belief, Rabobank paid this $15,627.98 to BMS pursuant to its contract with BMS.

61.     Neither Rabobank nor BMS had any permission from the United States Bankruptcy Court to withdraw any funds from the Fusari Estate to pay either Rabobank or BMS.

62.     The amount that Rabobank deducted in fees and, upon information and belief, paid to BMS was greater than the amount of the fees that would have been charged but for the conspiracy to fix the manner of charging Estates for Combined Services and to charge no fee for those Combines Services other than a percentage of the amount in the bank account of the Estate.

63.     The overcharge of BMS resulting from the conspiracy to fix the manner in which BMS charges Estates for Combined Services reduced the amount of money in the Fusari Estate.

64.     The Fusari case settled, and was dismissed by order of the Bankruptcy Court

entered May 6, 2016.

65.     Paragraph 16 of that order provided:

16.     <u>Revesting of Property in Debtor.</u>   Upon dismissal of the Bankruptcy Case, all
property of the Debtor's estate and of the Entities remaining after payment of the
amounts set forth above wherever located shall revest in the Debtor without further
Order of the Court.

66.     As a result of paragraph 16 of the May 6, 2016 order, after the making of the

payments due under that order, all remaining property of the Estate became the property of

Fusari.

67.     Fusari's property included the claim asserted in this action.

68.     All payments due under the order were made on or before June 1, 2018.

69.     By agreement as of July 27, 2018, Spinner acquired from Fusari the property that

had vested in Fusari under the order.  That property expressly included the claim asserted in this

action.

**I.     Stone Point's Joining of the Conspiracy**

70.     On or about April 12, 2017, Stone Point caused one of the funds that it manages

and controls, Trident, to acquire a controlling ownership interest in BMS.   The press release of

BMS provided in part:

Stone Point Capital Acquires Bankruptcy Management Solutions

Bankruptcy Management Solutions, Inc. ("BMS" or the "Company"), a software and
depository services company, announced today that the Trident VI Funds managed by
private equity firm Stone Point Capital LLC ("Stone Point Capital") have acquired the
Company. Founded in 1987, BMS is a leading provider of case management software
and banking services to bankruptcy trustees, restructuring professionals and other
fiduciaries throughout the United States. BMS software provides a variety of tools for
bankruptcy professionals in both Chapter 7 and Chapter 11 proceedings, including
integrated banking solutions, case administration, document management and claims
distributions.

71.     Upon information and belief, Stone Point conducted due diligence on BMS before the acquisition of BMS on or about April 12, 2017.

72.     Upon information and belief, before the acquisition of BMS on or about April 12, 2017, Stone Point learned of the conspiracy involving BMS to fix the manner of selling and charging for Combined Services.

73.     Upon information and belief, before the acquisition of BMS on or about April 12, 2017, Stone Point understood that McGarry & McGarry, LLC, a law firm in Chicago, Illinois, had filed a complaint against BMS in the Northern District of Illinois, entitled *McGarry & McGarry, LLC v. Bankr. Mgmt. Solutions, Inc.*, 16-cv-8914 ("McGarry Lawsuit").

74.     The BMS Document was publicly filed on the docket in the McGarry Lawsuit, as part of Dkt. 30-2, on November 18, 2016.

75.     Upon information and belief, before the acquisition of BMS on or about April 12, 2017, Stone Point (a) knew of the existence of the BMS Document, and (b) had read the BMS Document.

76.     Upon information and belief, with knowledge of the existence of the conspiracy and with the intent to continue that conspiracy, Stone Point caused Trident to acquire a controlling ownership interest in BMS.

77.      Upon information and belief, with knowledge of the conspiracy, Stone Point, through Trident, caused BMS to continue to participate in the conspiracy.

78.     Upon information and belief, Stone Point has engaged in acts in furtherance of the conspiracy, including but not limited to (i) in or after April 2017, developing and/or approving a business plan for BMS that required the continuation of the existing manner of selling and charging for Combined Services that resulted from the conspiracy, (ii) on or about September 5,

2017, causing Eric Kurtzman ("Kurtzman") and Jonathan Carson ("Carson") to be appointed co-Chief Executive Officers at BMS with the knowledge and intent that those individuals would continue the existing manner of selling and charging for Combined Services that resulted from the conspiracy, (iii) causing Anthony Facciano ("Facciano") a former employee of Epiq, to be elected as a director of BMS with knowledge and intent that he would continue the manner of selling and charging for Combined Services that resulted from the conspiracy.

79.     With knowledge of the conspiracy, Stone Point did not end or attempt to end BMS's participation in the conspiracy, but encouraged and/or assisted BMS in continuing the conspiracy.

**A FIRST CLAIM FOR DAMAGES**
**(Violation of 15 U.S.C. § 1)**

80.     Spinner repeats the allegations in the foregoing paragraphs with the same force and effect as if set forth in full.

A.     **The Violation of 15 U.S.C. § 1**

1.     **The Initial Conspiracy**

81.     In 2010, BMS, Epiq and, upon information and belief, TrusteSolutions conspired to sell Estates bankruptcy support services only in combination with bankruptcy banking services, and to charge Estates no fee for those Combined Services other than a percentage of the amount in the bank account of an Estate.

82.     This conspiracy violates 15 U.S.C. § 1.

a.     **Direct Evidence of the Conspiracy**

83.     The allegation that BMS conspired with Epiq, and, upon information and belief, TrusteSolutions – to sell Estates bankruptcy support services only in combination with bankruptcy banking services, and to charge Estates no fee for those combined services other than

14

a percentage of the amount in the bank account of an Estate – rests in part upon the following facts.

84.     On or before November 26, 2010, upon information and belief, BMS, Epiq, and TrusteSolutions communicated directly about selling bankruptcy support services only in combination with bankruptcy banking services, and charging an Estate no fee for those Combined Services other than a percentage of the amount in the bank account of an Estate.

85.     On or about November 26, 2010, BMS submitted the BMS Document to the Executive Offices of the U.S. Trustee.  The BMS Document confirmed that a conspiracy had already occurred.  The BMS Document provided in applicable part:

**Conversations**

**In several conversations with various participant banks, a number of options have been discussed.  Satisfying all of the conditions presented above, however, left a single structural option**.  Although the numbers vary slightly for each bank, the structure is constant with two key components:

First, since estates do not currently pay for services (banking and software) through a reduction in their interest income, **have them continue to pay for these services via a service fee, as a % of average deposit balance assessed monthly on each account**.

Second, while there would be a base service fee percentage the actual percentage applied would vary reflecting changes, hopefully improvements, in the interest rate market by being tied to the Effective Federal Funds rate.  As the Effective Federal Funds Rate increases, the service fee would be reduced, eventually disappearing as bank interest rates increase.

**Having determined a structural solution**, the principal remaining question of each bank was "what do you need to financially continue to participate in the Chapter 7 process including your expenses for administration and to fund your current software providers?" (Emphasis added.)

86.     Before creating the BMS Document, (i) BMS had conversations with various banks participating in the Chapter 7 program, which necessarily included the partner banks of BMS's horizontal competitors, and (ii) BMS reached an agreement with at least one of those

15

banks, and therefore one of BMS's horizontal competitors, to fix the manner of selling and charging for Combined Services.

87.     Epiq saw the BMS Document on or shortly after November 26, 2010, and agreed with the substance of it.

88.     On or about January 13, 2011, Epiq responded to the BMS Document by preparing a document entitled "Chapter 7 Industry Comments."  In that document, Epiq stated in part:

> **Epiq Systems' Comments on Proposal by BMS/Bank of NY Mellon**
>
> [Content redacted by U.S. Trustee pursuant to 5 U.S.C. § 552(b)(4)]  **This structure would promote future stability for trustee' activities, and it features well reasoned characters**:
>
> - the amount of the fee moves automatically with changes to market interest rates
> - **the fee is assessed uniformly to all estate accounts**
> - the fee extinguishes itself automatically in normal interest rate environments
> - **the fee is earmarked to support the technology and case management services** on which trustees rely for the orderly administration of their estates, and it is not a windfall for any market participant
>
> [Content redacted by U.S. Trustee pursuant to 5 U.S.C. § 552(b)(4)]
>
> **Epiq Systems' Proposal**
>
> [Content redacted by U.S. Trustee pursuant to 5 U.S.C. § 552(b)(4)]
>
> While this approach would not solve the problems that collateralized deposits on banks' balance sheets, it would nevertheless avoid the pending disruption to estate administration that we believe may otherwise occur. (Emphasis added.)

89.     Upon information and belief, TrusteSolutions saw the BMS Document on or shortly after November 26, 2010, and agreed with the substance of it.

90.     On January 21, 2011, Texas Capital Bank, on behalf of itself and TrusteSolutions, proposed to the U.S. Trustee that Estates be charged for Combined Services based upon a percentage of the amount of money in an Estate.  Texas Capital Bank stated:

> Due to the current interest rate environment financial institutions are able to secure deposits at virtually no operational cost.  The current UST program requires a high level of operational support, including banking support, software support and hardware support to bankruptcy trustees to remain in compliance with the UST requirements to administer bankruptcy estates that cannot be offset solely by the value of deposits maintained.  **Therefore TCB will need to assess to the bankruptcy estates a monthly Custodial Fee as a percentage of balances maintained to offset the operational support provided**.  Depending on the level of operational support required and the interest rate environment TCB will annually adjust the Custodial Fee accordingly. (Emphasis added.)

91.     Upon information and belief, Texas Capital Bank, acting on behalf of itself and/or TrusteSolutions, communicated this position to BMS and Epiq, either directly or indirectly.

### b.     Circumstantial Evidence of the Conspiracy

92.     The following facts demonstrate that BMS conspired with Epiq and, upon information and belief, TrusteSolutions to sell Estates bankruptcy support services only in combination with bankruptcy banking services, and to charge Estates no fee for those Combined Services other than a percentage of the amount in the bank account of the Estate.

### i.     Structure of the National Market
### for Bankruptcy Support Services

93.     The structure of the national market for bankruptcy support services facilitates collusion because those services are homogeneous; the demand for them is inelastic; the prices charged to Estates for the services are available from publicly filed reports of Trustees; the software creates barriers to entry; and the number of competitors is small.

ii.     **Communications Among the Firms**

94.     Upon information and belief, representatives of BMS, Epiq, and TrusteSolutions are, and at all relevant times have been, in regular communication.

95.     Specifically, representatives of BMS, Epiq, and TrusteSolutions have attended bankruptcy law conferences along with United States Bankruptcy Judges, U.S. Trustees and attorneys.

96.     Upon information and belief, representatives of BMS, Epiq, and TrusteSolutions attended bankruptcy law conferences sponsored by (i) The American Bankruptcy Institute, (ii) The National Conference of Bankruptcy Judges, and/or (iii) The National Association of Bankruptcy Trustees ("NABT").

97.     As a result of their attendance at such events, representatives of BMS, Epiq, and TrusteSolutions have had regular and frequent opportunities, and upon information and belief, have availed themselves of those opportunities, to meet with each other and discuss, coordinate and otherwise advance their conspiracy.

98.     At a July 25, 2012, hearing before the United States Bankruptcy Court for the Northern District of Ohio in *In re Bradley & Michelle Dorfler, et al.*, case no. 10-51411 (MSS), the Chief Executive Officer of BMS, Steve Coffey ("Coffey"), and a representative of Epiq, Scott Field, Esq. ("Field"), appeared and defended the fees of BMS.  The following colloquy ensued:

> THE COURT: Okay. Mr. Coffey, you heard me – I'll make sure your counsel doesn't mind my asking you questions directly. You know, if I'm asking – if I start to veer into any trade secrets or confidential information, then simply say so.
>
> MR. COFFEY: I don't think there will be a problem. Mr. Field is in the room and **I don't think we had a lot of secrets between us so that's fine**. (Emphasis added.)

### iii.      Announcement of Non-Price Competition

99.     In a competitive market without artificial restraints, firms seeking opportunities to provide bankruptcy support services to Trustees would compete based upon price.

100.    Upon information and belief, BMS, Epiq, and TrusteSolutions do not compete based upon price.

101.    In repeated filings with the Securities and Exchange Commission, Epiq has disclosed that it does not compete in the market for bankruptcy support services based upon price.

102.    In its Form 10K filed February 25, 2011, for example, Epiq represented:

**eDiscovery**

The e-discovery market is highly fragmented, intensely competitive and rapidly evolving. Competitors include Electronic Evidence Discovery, Inc., Fios, Inc., Kroll Ontrack (Altegrity Inc.), Attenex (FTI Consulting, Inc.), Autonomy ZANTAZ, Inc., Stratify, Inc. (Iron Mountain Incorporated), and Clearwell Systems, Inc. **Competition is primarily based on the quality of service, technology innovations, and price**.

**Bankruptcy**

Our bankruptcy segment competes in a more mature market. We are one of two primary providers in the Chapter 7 bankruptcy market, along with Bankruptcy Management Solutions, Inc.; and in the Chapter 11 bankruptcy market competitors include Kurtzman Carson Consultants LLC and The Garden City Group, Inc. In both the Chapter 7 and Chapter 11 markets there are also several smaller competitors. **Competition is primarily based on quality of service and technology innovations**. Competitors for our AACER® product include American InfoSource and LexisNexis® Banko® Solutions.

**Settlement Administration**

The primary competitors with our settlement administration segment are The Garden City Group, Inc., Rust Consulting, Inc., and Gilardi & Co LLC, as well as several smaller competitors. **Competition is primarily based on the quality of service, technology innovations, and price**. (Emphasis added.)

103.    Similarly, shortly after the decision of the U.S. Trustee to allow Trustees to pay service fees from Estate accounts, BMS publicly announced that it would not negotiate concerning fees with Trustees.  BMS stated in a document that it publicly distributed in or about June 2011:

**Is the Service Fee Negotiable?**

A.    No. In order to provide equal treatment in all bankruptcy cases, the Services Fee is based on a uniform rate as set forth above and is a condition of participation in the BMS program.

104.    Upon information and belief, with the exception of the limited discussions involving a small group of Trustees in the State of Illinois in or about late 2011, described below, BMS, Epiq and, TrusteSolutions have, despite requests to do so, refused to negotiate fees with Trustees.

105.    BMS has publicly encouraged Epiq and TrusteSolutions to continue resisting any effort to submit their fees to the Bankruptcy Court for approval on a per case basis.

106.    For example, in *In re Nanodynamics, Inc.*, case no. 09-13438 (MJK) (Bankr. W.D.N.Y.), Coffey of BMS testified in a declaration dated and filed September 12, 2011:

20.    Finally, I would like to address another issue that was raised at the August 31, 2011 hearing with regard to the pricing for BMS Services. At the hearing, the Court noted that:

*I do feel that the business model, pricing, in light of what you said, that's not based on monthly activity, it's not based on the burdens upon the service providers, it's based simply upon how many dollars are in an account . . . .*

[Transcript, 30:21- 31:2].

21.    The Court's observation is essentially correct, but that should not affect the allowance of the BMS Service Fee as an administrative expense, for at least three reasons…. Where, as here, the trustee in the exercise of his discretion has determined that the foregoing requirements are satisfied, I am not aware of anything that requires that a claim be measured by any particular method, such as the (a) cost to the provider of providing the service; (b) the amount of the service

actually used by the estate each day; or (c) the price at which a competitor might be willing to offer a similar product, albeit with a lower quality of service. If it were otherwise, then administrative expenses for things like a trustee's compensation under section 326(a), the UST's quarterly fees, or even the rent paid by a trustee for a facility to store estate property, would all be subject to retrospective revaluation on an individual case basis. **I would submit that under such a regime, few, if any, parties would be willing to do business with a chapter 7 trustee; BMS and BNY Mellon certainly would not**.

22.     Second, the BMS "flat" percentage fee structure exists for a reason, much like the rate structures for trustee compensation, UST quarterly fees, and, say monthly premises rent, are 'flat fee' based, rather than being based [on] use or activity levels. The reason is that no other structure is administratively feasible. BMS and BNY Mellon do business with hundreds of trustees across the nation, who collectively handle more than 50,000 "asset" cases currently (in addition to hundreds of thousands of "no asset" cases annually), it would be utterly impractical for BMS and BNY Mellon to negotiate hundreds, or thousands, of "one-off deals" with individual trustees, based on the facts and circumstances of each case; the costs of evaluating, negotiating and monitoring so many unique contracts would by themselves be prohibitive, to both the trustees and to BMS and BNY Mellon. **While the trustee services business may, if this interest rate environment continues, ultimately evolve to a different model, where pricing is based on a set schedule of fees and charges for numbers and types of transactions, at this point, that is simply not a business model that BMS and BNY Mellon are prepared to offer. When and if any other providers are willing to offer services under such a model, trustees of course have the ability to terminate their arrangements with BMS and BNY Mellon on 30 days notice, and to contract with such providers**, to the extent that the trustees believe that they should do so in accordance with the exercise of their fiduciary duties. (Emphasis added.)

107.     Similarly, on about January 12, 2016, Jill Bauer, Managing Director of Trustee and Fiduciary Services for Epiq, executed a declaration that BMS filed in *In re On-Site Sourcing, Inc.*, case no. 09-10816 (RGM) (Bankr. E.D. Va.), that confirmed that bankruptcy support service providers competed only in terms of market share and not in terms of the manner of charging fees, stating in part:

I also agree that compensation issues challenging our industry have necessitated service providers to transition to alternative pricing models while also actively and aggressively competing with one another to capture market share.  (Dkt. 920 at 2/7)

21

### iv. Refusing to Charge Separately for Services
### Despite Pressure from Bankruptcy Courts

108.    Despite pressure from certain United States Bankruptcy Courts to sell and charge for bankruptcy support services separately from bankruptcy banking services, BMS, Epiq and, TrusteSolutions continued to sell Estates only Combined Services.

109.    Beginning in the summer of 2011, Bankruptcy Courts in at least four districts questioned whether Trustees should pay fees for Combined Services.

110.    For example, in *In re Canopy*, case no. 09-44943 (ERW) (Bankr. N.D. Ill.), the following exchange took place on November 8, 2011 between the United States Bankruptcy Court Judge and Trustee Gus Paloian concerning the need to charge separately for, or unbundle, the bankruptcy support services and bankruptcy banking services:

> MR. PALOIAN: And so what we face now are the bundled services of Epiq plus a bank.
>
> THE COURT: Okay. **I think what we need is to unbundle it**.
>
> MR. PALOIAN: Yeah, exactly, Judge. **I couldn't agree more**. I've tried to do this. I've had these discussions. We're not necessarily at the point. **I have not been able to get a direct quote for just trustee/Epic [sic] software services**. (Emphasis added.)

### v. Excessive Prices

111.    BMS charged prices higher than the prices that it could charge absent the unlawful conspiracy, and Trustees have acknowledged that these amounts are excessive.

112.    On or about August 11, 2011, a Chapter 7 Trustee from the District of Arizona wrote to the members of the NABT:

> Somehow it sort of feels like we are being taken to the cleaners and can't do anything about it. We have become so dependent on the software that they can charge just about anything they want and what are we to do about it. Seems to me we need a REGULATOR to handle this and in my mind it should be the US Trustee. They need to step up and prevent this monopolizing by the BIG THREE and tell them what THEY think is a reasonable charge and that should be universally.  An annual fee which we can

spread among the estates pro rata like we do for the bond. **This is a train robbery and our creditors are the ones that are being taken advantage of**. While we get $60 a case, The BIG THREE (Epiq, BMS and Trustees Solution [*sic*]) gets to make hundreds of dollars per trustee per year just for providing SOFTWARE?  Something doesn't seem equitable! (Bold emphasis added.)

113.    On or about November 2, 2011, a Chapter 7 Trustee from the Northern District of

Illinois wrote to the members of the NABT:

> The problem is that we are looking in the wrong place for a solution.  The problem is we need software and support to keep track of our cases and do our reports.  We don't need computers, printers, monitors, scanners, etc. from the software vendor.  If the former model that provided all those perks is no longer sustainable, then we need to unbundle the package and pay for that which we need, not that which we want.  **The discussion should be with the software vendors to unbundle and do away with the dedicated banking relationships. There is little to recommend our continued commitment to the banks, given their reaction to the problem and their opportunistic pricing which seems far beyond anything that is reasonably tied to their costs. (I have a case with $12 million in it and I simply do not think it costs BofA $60,000 to service that case)**. (Emphasis added; original emphasis removed.)

114.    Epiq itself has acknowledged, in a communication to the Administrative Office of

the U.S. Courts that a fee of 0.50 to 0.75 percent would be reasonable except in unique

situations.  In a memorandum to the Administrative Offices of the U.S. Courts, Field of Epiq

wrote on April 2, 2012:

> Banks will not enter in to this business and wait for an order in the future authorizing the fee on a case-by-case basis or possibly risk disgorgement should a court determine them unreasonable. This does not mean that the judiciary needs to authorize the fees presently being charged by banks. **The courts could authorize some smaller number they feel is "reasonable" (such as 0.50% to 0.75%) and then allow a bank to request a higher amount for unique situations**.  (Emphasis added.)

**2.    <u>Stone Point's Liability for the Acts of the Conspirators</u>**

115.    In or about April 12, 2017, Stone Point caused Trident to acquire a controlling

ownership interest in BMS, upon information and belief, with knowledge of the conspiracy, and

with the intent to continue that conspiracy.

116.    After the acquisition of BMS, Stone Point upon information and belief committed several acts in furtherance of the conspiracy, including but not limited to, (i) developing and/or approving a business plan that required BMS to continue participating in the conspiracy, (ii) appointing Kurtzman and Carson co-Chief Executive Officers of BMS with the intent that they would cause BMS to continue to participate in the conspiracy, and (iii) causing Facciano to be elected a director of BMS with the intent that he would cause BMS to continue to participate in the conspiracy.

117.    After the acquisition of BMS, Stone Point, upon information and belief, caused BMS to continue participating in the conspiracy.

118.    As Stone Point intended, BMS continued to participate in the conspiracy after the acquisition.

119.    Stone Point joined the conspiracy and is jointly and severally liable for the acts of its co-conspirators, including those that occurred before Stone Point joined the conspiracy.

**B.**    **Standing**

120.    Spinner meets the constitutional requirements for standing to assert this claim.

121.    Spinner, as successor to Fusari, has sustained an injury in fact resulting from an overcharge attributable to the violation of 15 U.S.C. § 1.

122.    A monetary judgment in this action would remedy that overcharge.

123.    Spinner meets the statutory requirement for standing to assert this claim.

124.    Spinner, as successor to Fusari, has sustained an antitrust injury because that injury proximately results from the reduction in competition, and thus higher fees, for Combined Services as a result of the conspiracy in violation of 15 U.S.C. § 1.

125.     Spinner, as a successor in interest to the Fusari Estate, is a direct purchaser from BMS.  No one is any closer to the damage that the conspiracy caused to the Fusari Estate than Spinner.

126.     Spinner will efficiently enforce the antitrust law.  No other person has a greater incentive and ability to enforce the antitrust law with respect to this violation.

## C.     Damages

127.     As a proximate result of the anti-competitive activities of Stone Point in violation of 15 U.S.C. § 1, Spinner has sustained damages to its business and property in an amount to be determined by the trier of fact in this action.

128.     Spinner has not suffered any injury asserted in this action based upon any (i) conduct of the government, (ii) conduct of any conspirator that the government compels, or (iii) conduct of any conspirator in petitioning the government.

129.     15 U.S.C. § 1 entitles Spinner to recover compensatory damages, prejudgment interest, treble damages, costs and reasonable attorneys' fees.

### A SECOND CLAIM FOR DAMAGES
#### (Cal. Bus. & Prof. Code § 16726)

130.     Spinner repeats the allegations in the foregoing paragraphs with the same force and effect as if set forth in full.

131.      Upon information and belief, a substantial part of the acts of Stone Point in furtherance of the conspiracy were committed in the State of California, including acts committed at the principal place of business of BMS in Irvine, California.

132.     By its participation in the conspiracy, Stone Point has violated Cal. Bus. & Prof. Code § 16726.

133.    Spinner, as successor in interest to the Fusari Estate, has been injured in its business and property by reason of the conspiracy, in violation of Cal. Bus. & Prof. Code § 16726.

134.    Spinner is therefore entitled to recover from Stone Point the entire amount of its damages resulting from the conspiracy.

## A THIRD CLAIM FOR DAMAGES
### (C.G.S.A. § 35-26)

135.    Spinner repeats the allegations in the foregoing paragraphs with the same force and effect as if set forth in full.

136.    Upon information and belief, a substantial part of the acts of Stone Point in furtherance of the conspiracy were committed in the State of Connecticut, including through the representatives of Stone Point acting from its corporate headquarters in Greenwich, Connecticut.

137.    By its participation in the conspiracy, Stone Point has violated C.G.S.A. § 35-26.

138.    Spinner, as successor in interest to the Fusari Estate, has been injured in its business and property by reason of the conspiracy in violation of C.G.S.A. § 35-26.

139.    Spinner is therefore entitled to recover from Stone Point the entire amount of its damages resulting from the conspiracy.

## CLASS ACTION ALLEGATIONS

140.    Spinner repeats the allegations set forth in the foregoing paragraphs with the same force and effect as if set forth in full.

141.    Spinner is bringing this action as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of itself and a class of persons similarly situated.

142.    The class is defined as the persons who have paid fees to BMS after July 31, 2014, as a result of Rabobank's deductions from the accounts of Estates at Rabobank, for

Combined Services, including Estates and their successors in interest, excluding the judicial officers adjudicating this action and any member of their immediate families.

143.    Upon information and belief, the identities of the members of the class are ascertainable.

144.    The class is sufficiently numerous that joinder of all members is impracticable. Upon information and belief, the class is comprised of at least hundreds of Estates and persons.

145.    There are questions of law and fact common to the class.  These questions include: Did Stone Point conspire with BMS, Epiq, and/or TrusteSolutions, in violation of 15 U.S.C. § 1?  How much money would the Estates have paid for Combined Services but for the conspiracy in violation of 15 U.S.C. § 1?

146.    The claims of Spinner are typical of the claims of the class.

147.    Spinner will fairly and adequately protect the interests of the class.  The interests of Spinner are coincident with those of the remainder of the class.  Competent counsel represents Spinner.

148.    The questions of law and fact common to the class members predominate over any questions affecting only individual members, and a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy.

WHEREFORE, Spinner, individually and on behalf of those similarly situated, demands judgment against Stone Point:

(a)    Awarding judgment for compensatory damages, prejudgment interest, treble damages, costs, expenses and reasonable attorneys' fees in an amount to be determined by the trier of fact based upon the evidence presented at trial; and

(b)    Granting such other and further relief as to the Court seems just and proper.

27

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Spinner demands a trial by jury of all issues in this action that are so triable.

MANDELBAUM SALSBURG P.C.


By  s/ Ronald. D. Coleman   
          Ronald D. Coleman

-and-

DUNNEGAN & SCILEPPI LLC

By  s/ Laura Scileppi         
          Laura Scileppi

Dated:  June 6, 2019                  *Attorneys for Plaintiff*

# **<u>Exhibit A</u>**

Case: 1:16-cv-08914 Document #: 30-2 Filed: 11/18/16 Page 3 of 6 PageID #:225

**Bank Participation In The Chapter 7 Program**

Discussion Outline

**Background**

In recent years the process of administering Chapter 7 cases has become more complex causing the volume of work on the part of panel trustees, US Trustees and all of the administrative and regulatory participants to increase significantly.  With this complexity the process has evolved to the point where the service providers (banks and software companies) have become an integral part of the process.

Traditionally, the contributions of the service providers have been paid for by each beneficiary Chapter 7 estate through a process whereby each estate received a rate of interest that reflected a discount from market rates in exchange for such services.

The process described above always assumed that the banks would want deposits, pay interest on those deposits and fund the software companies who in turn provide software, hardware and services to the Chapter 7 Trustees completely free of charge.  Recent long-term changes in the economy and the banking environment have completely dismantled this premise.

**Issue**

In today's environment Chapter 7 accounts are not profitable for the banks.  In some cases, these accounts are not only unattractive financially but work against other regulatory financial requirements that have been or are anticipated to be made a part of our banking system.  The net result is that Chapter 7 deposits are undesirable and capacity for such deposits is being reduced drastically.

Essentially, the current economic crisis has shifted the cost of banking and case management software from the beneficiary estates to those entities (banks and software companies) providing the services.

In response to this situation, banks are taking actions to cut their losses in this business line including: reducing interest rates, initiating collateral and administrative charges; discouraging trustee deposits; and, to the extent contractually possible, eliminating the historical "referral fees" that fund the software providers that the trustees have come to rely on for the efficient administration of their cases.  These steps are being taken even to the extent that banks are significantly reducing deposit capacity and in some cases simply refusing deposits.

1

One major bank ceased its participation in the Chapter 7 Program earlier this year.  At least two others have made it no secret that at the earliest opportunity they intend to withdraw their participation as well.

**Challenge**

Recognizing the banks' critical role in maintaining both the integrity of the system and the services provided to the trustees, the challenge is to find a mechanism that will cause the banks to continue to participate in the Chapter 7 process.

Given that in the current interest rate environment, the previous funding for these banking and software services no longer exists, a second part of the challenge is to determine how to provide such funding.

**Solution Concept**

In designing a program to meet this challenge there are a number of criteria that should be met as part of any solution.  Among the criteria addressed in developing a response to the current situation, the key was to find a solution that:

- recognizes that the current situation is temporary (until deposit demand and interest rates increase)
- terminates automatically as conditions improve
- is formulaic and not subject to interpretation
- is tied to a federal index not subject to manipulation yet indicative of a change in the banking environment
- provides the banks with adequate compensation to remain active participants in the program
- continues the historical process of allocating the cost of the services to the estates that are the beneficiaries of those services
- is a permanent solution that will avoid having to reopen this issue should volatility in the banking world cause similar circumstance to reoccur.

**Conversations**

In several conversations with various participant banks, a number of options have been discussed.  Satisfying all of the conditions presented above, however, left a single structural option.  Although the numbers vary slightly for each bank, the structure is constant with two key components:

First, since estates do not currently pay for services (banking and software) through a reduction in their interest income, have them continue to pay for these services via a service fee, as a % of average deposit balance assessed monthly on each account.

2

Case: 1:16-cv-08914 Document #: 30-2 Filed: 11/18/16 Page 5 of 6 PageID #:227

Second, while there would be a base service fee percentage, the actual percentage applied would vary reflecting changes, hopefully improvements, in the interest rate market by being tied to the Effective Federal Funds rate. As the Effective Federal Funds rate increases, the service fee would be reduced, eventually disappearing as bank interest rates increase.

Having determined a structural solution, the principal remaining question of each bank was "what do you need financially to continue to participate in the Chapter 7 process including your expenses for administration and to fund your current software providers?"

Due to the uncertainty and varying estimates of collateral costs and several regulatory and competitive unknowns regarding payment of interest on estate accounts, in order to provide a baseline to their consideration the fee question was conditioned as independent of any collateral or interest expense. The thought was that collateral charges would be addressed separately (possibly as an additional fee on the excess deposit accounts) and that interest is currently low enough not to be a significant issue in the current consideration.

After internal review and considerable conversation, while the banks did not provide hard numbers, some consensus did surface regarding both the fee percentage and the application of the Effective Federal Funds rate as the benchmark for reducing the fee.

**Formula Detail**
Each estate would be assessed a monthly fee calculated as follows: multiply the average Deposit Balance (including deposits of all sorts such as cash and securities eligible under 11 USC 345) for the month by the difference between the Service Fee % less the average Effective Federal Funds rate (EFF) for the month then multiplying the resultant by the quotient of the number of days in the month divided by the number of days in the year.

The formula would be expected to serve as an industry floor applied evenly to all Chapter 7 accounts.

The formula would be expected to be a permanent part of the process relying on the formula itself to cause the service fee to, effectively, be temporary.

Open issues include:
- Fee Percentage: Since the banks did not provide hard numbers, an open issue is the final fee percentage. The discussions generally ranged from 3.5% to 4% with occasional consideration of 3%.

3

- Federal Funds Adjustment Threshold: The method of applying the adjustment to the fee reflecting the EFF rate also varied.  Suggestions range from having the adjustment reflect EFF on an actual one-to-one basis (ex: a reduction in the fee for each bp of the EFF) with no minimum to having the one-to-one impact occur only to the extent that the EFF exceeds a floor of 200 bps.

Although not included in the base service fee, the issue of relief from collateral charges and possibly FDIC assessment charges must also be separately addressed.

**Opinion**

Based on the conversations with the banks and independent research regarding bank costs and profitability targets, it is believed that a rate as low as 3% with the fee adjustment reflecting the actual EFF (i.e. without a threshold floor) may be adequate to attract the banks to continue their full participation to include the funding of the software providers.

Collateral and interest costs should be addressed separate and apart from the base service fee, possibly on an individual bank basis.

**Suggestion**

A potential next step in this process could be for EOUST representatives to discuss the above directly with the major banks currently involved to validate both the premise that the banks do not wish to continue supporting the Chapter 7 Program under the current circumstances and the acceptability of the concept and formula noted above.

Assuming such validation, the final step prior to EOUST consideration, would be to establish a consensus regarding the base service fee percentage and the EFF adjustment threshold that encourages the banks' continued support of the Chapter 7 program.